(C.D. 2328)

Excelsior Accordions, Inc. *v.* United States

United States Customs Court, First Division

(Decided April 4, 1962)

*John D. Rode* for the plaintiff.

*William H. Orrick, Jr.*, Assistant Attorney General (*Mollie Strum* and *Harold L. Grossman*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

OLIVER, Chief Judge: This protest involves certain merchandise, described on the invoice as "CHORDETTES (Electric Accordions)," which was assessed with duty at the rate of 20 per centum ad valorem under the provision for organs in paragraph 1541(a) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade (T.D. 52739). Plaintiff claims that the articles in question are not organs and that they are properly classifiable under the residuary provision for musical instruments, not specially provided for, in paragraph 1541(a), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade (T.D. 54108), carrying a duty assessment of only 17 per centum ad valorem.

The vice president of the plaintiff corporation, a manufacturer and importer of pianos and accordions, stated that he has been familiar with the article in question since the latter part of 1958 and that it has always been known and sold as a chord organ. Describing the instrument under consideration (plaintiff's exhibit 1), the witness testified that it is composed of a treble keyboard of 37 keys and a bass system of chords and that it functions through two sets of reeds that are arranged on each side of the instrument. The reeds on the right side are for the treble; the reeds on the left side are arranged as a bass system of chords. Removing the bottom section of the instrument exposes an electric motor with an impeller, which is a fan system that builds up air pressure, causing the sets of reeds to vibrate and produce musical tones when the reeds are released by pressing the keys of the treble keyboard and the buttons for the bass system of chords.

The treble keyboard and the bass system, with the arrangements of reeds that vibrate when air pressure is applied, are the same as those which are found in an accordion (plaintiff's exhibit 2). The ma-

terial difference between the accordion and the chord organ in question is in the manner or method by which air pressure is applied. In the instrument under consideration, the sounds are produced by means of an electric motor with an impeller; in the accordion, sounds are produced by manual extension and contraction of bellows. The witness played a tune on both instruments and then stated that the sounds produced by each are similar. Another distinction between the two instruments, as explained by the witness, is that the accordion is portable and played while the musician carries it over his shoulder by means of a strap secured to the instrument, whereas the chord organ is made to be played, either by setting it on top of a table or when held upright by legs that are detachable, and which accompanied the imported instrument (plaintiff's exhibit 1-A).

Learning to play the chord organ in question is a relatively simple matter. When an instrument, like the one under consideration, is sold, the purchaser receives a book titled, "Music Selections for the M A G N U S Chord Organ" (plaintiff's exhibit 3). The book contains 25 songs or musical selections, arranged for this chord organ. All of the individual notes are numbered, and each line of notes has a circled letter at the beginning. The numbers above the notes correspond with those on a chart placed above the keyboard to identify the treble keys on the instrument. The circled letters serve as the guide for the chords, which are identified by the lettered buttons on the left side of the instrument and which the musician operates with his left hand. The music book (exhibit 3, *supra*) can be used to play the accordion (exhibit 2), but it is not susceptible of use as music for an organ. Two music books (defendant's illustrative exhibits C and D) were identified by the witness as containing musical arrangements for the chord organ. He stated that the books were prepared by Pietro Deiro, Jr., a well-known accordionist and arranger of accordion music. The witness concluded his testimony with the opinion that he did not consider the instrument in question to be an organ and that he did not regard anyone who played such an instrument to be an organist.

Plaintiff's second witness is the owner of the Biviano School of Music in New York City. He is a highly qualified musician who studied at the Damrosch Conservatory and the Juilliard School of Music. He played as first accordionist with the New York Philharmonic and also appeared with the Metropolitan Opera Co. He gives private instructions to professional accordionists. The witness stated that he has been a member of the musicians' staff of the National Broadcasting Company, the Columbia Broadcasting System, and the American Broadcasting Company. With all of those companies, he performed as a soloist, orchestra member, and conductor. He orchestrated and

arranged compositions for radio and television shows, dramatic shows, moving-picture shorts, and also "recorded extensively for R.C.A., Columbia, and Sonola." (R. 48.) The witness organized the Accordion Symphony Society of New York, and he is president of the American Accordionists Association. In addition to his experience as an accordionist, the witness studied the Hammond organ.

The witness testified that he has been familiar with the instrument in question (exhibit 1, *supra*) "since it first came out on the market" (R. 50) and that it is played exactly the same as the accordion (exhibit 2, *supra*), so far as using the right hand for the treble keyboard and the left hand for the bass chord system. With the use of the music book (exhibit 3, *supra*), the witness played "The Merry Widow Waltz" on the chord organ under consideration and on the accordion, and then stated that the quality of musical tones "is practically the same on both instruments," that neither instrument sounds like an organ, and that both instruments are "free reed instruments," which he described as follows (R. 55):

> That's the terminology which is used on an instrument where the reeds are placed on a block, and they're caused to vibrate by forcing air through a hole in the block.

Distinguishing between musical arrangements for the organ and music arranged for the chord organ, the witness referred to the selection "Mendelssohn's 'Wedding March,'" as it appears in the arrangements for the organ (plaintiff's exhibits 4 and 5) and the arrangement for the chord organ (plaintiff's exhibit 3), and testified as follows:

> Q. Now, will you please compare, Mr. Biviano, the arrangement, these three arrangements, and show how they differ?
>
>    *       *       *       *       *       *       *
>
> A. In Exhibit 3 the "Wedding March" is arranged with one staff, with the chord notation written above it. In Exhibit 4, it's written in three staves, which would make it possible for it to be played on the organ.
>
> Q. Now, could you play the arrangements in Exhibits 4 and 5 on Exhibit 1?—A. No, you could not.
>
> Q. Would Exhibit 3, the arrangement in Exhibit 3, ever be used to play the organ?—A. No, it would not.

In further testimony, the witness stated that he considered an organ to be an instrument having two or three manuals, or keyboards, feet pedals, and stops and that he never heard the term, "organ," used to describe any instrument like the article involved herein.

On cross-examination, the witness testified that the instrument in question is neither an accordion nor an organ.

Two witnesses testified on behalf of defendant. One is the music buyer, and in charge of the music department, of Macy's Department Store. The other is the vice president in charge of sales of the Emenee Audion Corp., a manufacturer of chord organs and accordions. Their

combined testimony, coupled with the advertising circular (defendant's exhibit E) and the page from a catalog (defendant's exhibit F), is to the effect that the instrument in question is bought and sold as a chord organ and that it is not an accordion.

There was no specific provision for organs in the Tariff Act of 1930, as originally enacted. Paragraph 1541(a) thereof contained a general provision for musical instruments, not specially provided for, which was followed by an *eo nomine* provision for pipe organs, carrying a lower rate of duty than that imposed on the musical instruments within the general provision.

The term "organs" appeared, for the first time, in the modification of paragraph 1541(a) under the General Agreement on Tariffs and Trade, T.D. 51802, where the word was used as the name of a class of instruments excluded from the lower rate of duty granted to certain musical instruments that were not specially provided for.

In a later modification of paragraph 1541(a), T.D. 52739, *supra*, the *eo nomine* provision for organs, invoked herein by the collector, appeared in statutory language, reading as follows:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 1541(a) | Musical instruments and parts thereof, not specially provided for: | |
| |      \*    \*    \*    \*    \*    \*    \* | |
| | Harmonicas and parts thereof_____ | _____20% ad val. |
| | *Organs and pianos, and parts thereof__* | _____20% ad val. |
| | Wood-winds and parts thereof_____ | _____15% ad val. |
| | Other, and parts thereof (except concertinas and all other accordions, cymbals and other percussion instruments, music boxes, stringed instruments, parts of any of the foregoing, and brass-winds with cup mouthpieces) [Italics supplied.]___ | _____20% ad val. |

The latest modification of paragraph 1541(a), T.D. 54108, *supra*, under which plaintiff seeks classification for the present merchandise, mentions organs as one class of musical instruments that is not specially provided for and which is not entitled to the lower rate applied therein.

From the foregoing analysis of paragraph 1541(a), it appears that the *eo nomine* provisions for organs, as they appear in the modified forms of the said paragraph, under T.D. 51802 and T.D. 52739, *supra*,

have been carved out of the general provision for musical instruments, not specially provided for, and that, under the principle that the modification of a paragraph of the tariff act pursuant to a trade agreement will change "the rate of duty only on articles already embraced within the scope of said paragraph," *United States* v. *Canadian National Railways*, 29 C.C.P.A. (Customs), 272, C.A.D. 202, the specific provisions for organs in the modifications to paragraph 1541(a), *supra*, embrace such organs theretofore included within the residuary provision for musical instruments, not specially provided for, which covered all organs, except pipe organs, that have been separately provided for since the enactment of the Tariff Act of 1930.

The importance of the review of paragraph 1541(a), as hereinabove outlined, is its effect in limiting the present issue to the sole question whether the instrument is an organ. If so, the collector's classification will stand; otherwise, plaintiff's claim must be sustained.

That the article in question is a chord organ, and so known and recognized, is not disputed. However, the identification of the instrument as a *chord organ* does not establish its tariff classification as an *organ*. It is well settled that "the use of an adjective before an *eo nomine* designation of a commodity does not, of itself, establish commercial designation of such commodity," *J. Milton Hagy Waste Works* v. *United States*, 2 Cust. Ct. 385, C.D. 162. To prove commercial designation, it is essential to show that the statutory phrase or term under consideration had a definite, uniform, and general meaning in the trade and commerce of the United States as of the time of enactment of the tariff act, which was different from the ordinary common meaning, and then to prove what such commercial meaning was. *Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, T.D. 42641, and *Neuman & Schwiers Co., Inc.* v. *United States*, 24 C.C.P.A. (Customs) 127, T.D. 48606. The rule that proof of commercial designation must be made in terms of the statute also applies to amendments to the statute made by trade agreements. *Stephen Rug Mills* v. *United States*, 32 C.C.P.A. (Customs) 110, C.A.D. 293. The record herein will not support application of the principle of commercial designation within the requirements enunciated in the cited authorities. We proceed, therefore, to a consideration of the common meaning of the word, "organ."

Webster's New International Dictionary includes the following definition:

organ, * * * b  A wind instrument, in its complete modern form the largest, most powerful, and most varied in resources of musical instruments, consisting of from one to many sets of pipes, sounded by compressed air, and played by means of one or more keyboards; a pipe organ;—formerly called also *organs* or *a pair of organs*. The modern organ has the following features:  (1) The *console*, or key desk, at which the organist sits, consisting of the manual and pedal boards, the stop knobs (or other apparatus for controlling the stops),

the couplers, the combination pedals and pistons, the swell pedals, indicators of various sorts, and other mechanical accessories.

In Funk & Wagnalls New Standard Dictionary, the word, "organ," is defined as "a musical wind-instrument containing a collection of wooden or metallic pipes made to sound by means of compressed air from bellows, and played upon by means of keys."

The Encyclopedia Americana contains the following:

ORGAN * * * a name applied to several musical instruments that are in construction and principle somewhat closely allied; but more distinctively appropriated to the largest of these, the pipe-and-pedal organ, which may be briefly described as a wind instrument, the sounds of which are those of a great number of pipes of varying lengths.

\*        \*        \*        \*        \*        \*        \*

In about 1935 the electronic organ made its first appearance in the United States, England, and Germany, amplification being by means of radio principles. Owing to the small size and portability of these organs, they achieved wide popularity, although there continues to be some difference of opinion as to their relative musical quality. The tone cabinet may be placed in any position, or at a distance from the console, if desired, and the instrument may be made to sound loud or soft. The consoles are of two manuals and pedal.

The article in question has none of the essentials of an organ, as set forth in the above-quoted authorities. Unlike an organ, the instrument under consideration, as shown by plaintiff's uncontradicted testimony and disclosed from an examination of the sample (exhibit 1, *supra*), has no pipes or sets of pipes, no pedal manuals or pedal keyboards, no couplers or swell pedals. On the contrary, this chord organ is of plain construction and simple design and evidently was intended for use by individuals having very limited knowledge of the techniques of playing music. Music for the organ cannot be used to play the instrument under consideration. Instead, special arrangements of music, marked with numbers and letters to agree with a chart placed above the keyboard, are used to play this chord organ. The tonal qualities of the music produced on this instrument are not comparable with those of an organ. The unique construction of the article involved herein, coupled with the unusual arrangement of music employed in playing the instrument and the manner in which musical tones are produced, removes the chord organ in question from the category of any musical instrument of a specific designation. The present merchandise is properly classifiable under the residuary provision for musical instruments, not specially provided for.

The principle that an *eo nomine* designation without words of limitation includes all forms of the article, suggested in defendant's brief, has no application herein. The rule has been invoked upon a finding that an imported commodity was a class or a kind of merchandise that was *eo nomine* provided for in the tariff act. *United States* v. *Fries*

*Bros., Inc.*, 37 C.C.P.A. (Customs) 36, C.A.D. 416. In this case, the article in question, concededly a chord organ, is not an organ within the meaning thereof for the purposes of this case.

Consideration has been given to all of the cases cited and all of the authoritative references mentioned in the briefs filed by counsel for the respective parties. Our discussion herein includes only those judicial and lexicographic authorities deemed necessary to support the conclusion reached.

On the basis of the present record and for all of the reasons hereinabove set forth, we hold the chord organ in question to be properly classifiable under the provision in paragraph 1541(a) of the Tariff Act of 1930, as modified by T.D. 54108, for musical instruments, not specially provided for, and dutiable thereunder at the rate of 17 per centum ad valorem, as claimed by plaintiff.

The protest is sustained and judgment will be rendered accordingly.